# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JUSTIN COLEMAN,                 :

                          :       **Hon. Joseph H. Rodriguez**

     **Plaintiff,**          :

                          :       **Civil No. 17-2581**

       **v.**                :

                          :

**DELANEYS' CAPE MAY, LLC**     :

                          :       <u>**OPINION**</u>

                          :

     **Defendants.**        :

     This matter comes before the Court on Motion for Summary Judgment of Defendant Miquon, Inc. who is the owner and operator of Delaney's restaurant in Cape May, New Jersey.   Plaintiff Justin Coleman was a seasonal employee at Delaney's during part of the Summer in 2015.   Coleman worked as both a server and a bartender during the weeks between July 15, 2015 and September 21, 2015.   As is its alleged custom, Delaney's terminated 55 employees, including Coleman, at the end of the Summer season in 2015.

     Coleman, who is African-American, claims his termination was motivated by racial animus and he asserts several claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, <u>et</u> <u>seq.</u> and Title VII of the United States Code, 42 U.S.C. § 2000e-3. Specifically, Coleman alleges (1) that he was terminated solely because of his race, (2) that he was the subject of disparate treatment at Delaney's, (3) that he was subjected to a racially offensive and hostile work environment, and (4) that he was terminated in retaliation for having complained about racially offensive conduct at the restaurant.   Defendant Miquon moves for summary

judgment as to all of Coleman's claims.

The Court has considered the written submissions of the parties as well as the arguments advanced at the hearing on April 16, 2019. For the reasons expressed on the record that day, as well as those set forth below, Defendant Miquon's motion is granted.

## I. <u>Background</u>

Miquon hired Coleman as a part-time, seasonal employee at Delaney's on July 15, 2015. (Slawek Decl. ¶ 9.) In terms of seniority, Coleman was one of the last staff members brought on at Delaney's for the 2015 summer season; joining the team in mid-Summer, he was last on the seniority scale. (<u>Id.</u>) Coleman claims that he was hired as a bartender, but was quickly replaced with non-African American bartenders. SOF at ¶ 35. Miquon agrees that Coleman was shifted away from the bar and into a server position, a transition Coleman agreed to make. According to Miquon, the manager at the restaurant decided to expand the number of bartenders on a single shift from two to three bartenders when Coleman was hired. (Slawek Decl. ¶ 12.) That staffing model proved unnecessary because of slow business and a change was made to the number of bartenders staffed on a single shift. (<u>Id.</u> at ¶ 13.) Under this new staffing model, Coleman was re-purposed and agreed to work as a server; he often received the most lucrative assignment station on the floor and his compensation was not impacted by his change of duties. (Slawek Decl. ¶ 13.)

During Coleman's eleven-week tenure, he worked part-time, approximately two to four days per week between Wednesday and Saturday. (Slawek Decl. ¶ 14.) Miquon states that Coleman had some performance problems, but his work was satisfactory and,

while he was spoken to about some issues, he was never written up for any missteps. (Id. at ¶¶ 15- 16.)

According to Coleman, he endured a hostile work environment in which many Delaney's employees frequently hurled racial epithets when referring to customers and to each other. Although Coleman himself was never referred to in a racially insensitive manner, his presence during the use of racially charged and inappropriate comments and banter caused him undue stress. Coleman sets forth the following litany of events in his brief in opposition, which captures the allegations made during his deposition:

-Co-Worker Tracy Venturini commented to Mr. Coleman, "What are you doing here? They don't hire black bartenders. The last one didn't work out. This is an Irish pub." SOF at ¶ 25 (Coleman Dep. Tr., Ex. H at 37:22- 38:14);

-Caucasian co-workers, including Tracy Venturini, Eric Bednar, and Vadim Bondarenko used the phrases, "don't make me get Black on you", "yo nigga", and "my nigga" in Mr. Coleman's presence. SOF at ¶ 26;

-Caucasian co-workers, and Mr. Coleman's immediate supervisor Ed Nielsen referred to African Americans as "They" and "You People". SOF at ¶ 27;

-When rap or hip-hop music was played on the jukebox, Mr. Nielsen would turn it off or turn it down and scold Mr. Coleman and other staff, telling them, "Don't play that type of music. No black music." SOF at ¶ 28;

-Mr. Nielsen threatened that "if anybody else plays black music, then they'll get fired." SOF at ¶ 28;

-Ms. Venturini, Mr. Bednar, and Mr. Bondarenko used the word "Nigger" "quite frequently" at the Miquon workplace, in Mr. Coleman's presence. SOF at ¶ 29;

-Eric Bednar specifically, "used it often...in all types of contexts. Like when he was frustrated, when he wasn't, he would just use it all the time" including during conversations with Mr. Coleman or while standing right next to him. SOF at ¶ 29;

-This use of the word "Nigger" all the time is corroborated by Mr. Bednar and Mr. Bondarenko's social media postings. SOF at ¶ 30;

-There is evidence that other employees at Miquon also find it to be a racially hostile environment like Mr. Coleman alleges. SOF at ¶ 32;

-Defendant admits that an employee complained that there was a racial slur made at Delaney's in the Summer of 2015 during Mr. Coleman's employment, and that Miquon suspected it may have been Mr. Coleman who complained. SOF at ¶ 33;

-When asked whether the individual who made the racial slur was identified, Mr. Nielsen, Miquon's General Manager, testified that he "never looked into it. There was no need. ... I didn't research who, what, why, or when." SOF at ¶ 34; and

-Mr. Coleman was subjected to differential treatment in the form of unwarranted criticism or discipline his Caucasian counterparts were not subjected to. For example, Mr. Coleman was disciplined for using his cell phone while at work, while a non-African American employee who was also using her phone directly next to him was not similarly criticized or disciplined.

Miquon claims that Delaney's has had multiple African-American bartenders during its existence, including Anna Moore, who worked as the head bartender at Delaney's before accepting a position as an executive at Resorts International, Serafina Moore, and Coleman's cousin Ashley Coleman. (Id. at ¶ 27.) It also claims that Coleman was never subjected to racial comments by staff, a fact Coleman appears to agree with, stating in deposition that the racial comments he complains of were never directed toward him personally, but notes he "was in the area" and heard it. (Coleman Dep. Tr., Ex. H. at 41:23-44:2.)

In deposition, Coleman had trouble placing almost all of the alleged comments "his ears heard" into context. (Id. at 47:16-51:5; 44:1-2.) He stated that employees Tracy, Eric, Vadim, and Tyler made racial comments "all the time." Id. at 42:17-19. He

recounts Tracy stating "don't make me get black on you" meaning that she was frustrated with a customer and was going to get hostile and angry. Id. 43:1-17. Although not directed at Coleman, because he heard the comment, he claims he reported it to "Bob." Id. at 44:21-25.

> Q. To Bob? What's his last name?
> A. I don't recall his last name.
> Q. And was it that specific comment that you were complaining about?
> A. Yes, because at this time it was enough.
> Q. And what was his response?
> A. He didn't – he just kind of brushed it off. He didn't really say anything at that point.
> Q. Did you ever report that statement to Ed Nielsen?
> A. Not right away, no.
> Q. How long did you wait?
> A. I don't recall, but it wasn't the same night because Bob was on duty that night.
> Q. Well, how soon into your appointment did you hear that comment?
> A. Which comment?
> Q. The comment "don't make me go black on you."
> A. I don't recall the timeline.
> Q. A week, a month?
> A. I don't recall the timeline.

Id. at 45.

Other incidents include the use of the word n***** "quite frequently." Id. 47:12-15. When asked in deposition about the use of this word, Coleman was unable to recall dates, context, or circumstances of the utterances. Id. at 48-50.

> Q. I'm asking you under what circumstances let's start with Eric. When did he use that expression and in what context?
> A. He used it often. It was in all types of contexts. Like when he was frustrated, when he wasn't, he would just use it all the time.
> Q. Tell me under what circumstances. Would he direct it at you, or was he directing it at the world in general, like a curse word to the masses or was it to you?

A. I wouldn't specify a racial slur as a curse word on the same level of weighing, so I'm confused about how you're trying to pose the question.

Q. I'm simply asking you when did Eric, under what circumstances did he

A. I don't recall the circumstances. It was said multiple times. That's the reason why I went to the management and stated. I think -- from my interpretation, you're minimizing the fact that it was said.

Q. No, I'm not. Let's get away from interpretation. I'm asking you -- you told me what he said. I'm asking you in what situation did he make the statement and to whom.

A. I don't recall the stated. It was just too frequently. He said it a lot.

Q. But was he saying it directly to you personally?

A. we're having a conversation, he would say it in us talking, or if I'm like right next to him, you're in a restaurant, so when you're picking up drinks or anything else and you say it, you still said it. It doesn't matter.

Q. But try to tell me what context he said it in.

A. I don't recall. I don't think it matters.

Q. Well, it matters to me.

A. Okay. To me a racial slur is a racial slur.

Q. And it could matter to the Court. You can't recall the context in which he said that?

A. I said that three times at this point. I don't recall.

Q. So did you at any point think when he used the "N" word, that he was joking with you in any way?

A. No, I didn't know that racial slurs were a joke.

Q. I'm not saying they are. I'm just asking, did you ever interpret them that way?

A. I never interpret any type of ignorance or racial slurs as a joke. I'm sorry.

Q. What about Tracy, same kinds of –

A. I reiterate the same thing. I never think racial slurs or ignorance are ever a joke. They're derogatory.

Q. Let's go to Tracy so you can answer my questions. What words did she use that you found --

A. Same words.

Q. Same words?

A. Yes.

Q. And I'll ask you again. Do you remember the context in which she used any of those words?

A. I do not.

Q. And would your answer be the same for Vadim? I think you mentioned Vadim.

A. Yes.

Q. Same answer?

A. Yes.

Q. And, again, you don't recall the context but same answers as the other

two?
A. Yes.
Q. Did you hear these comments throughout the time you were at
Delaney's, or was it for a particular period of time?
A. No.

<u>Id.</u>
    .

Coleman states he verbally complained to Ed and Bob, and eventually Bobbie, but that he could not recall the timeline, or whether he complained during his first month of the job. <u>Id.</u> at 51:10-25.

Miquon argues that Coleman was terminated because of a decline in the need for a robust seasonal workforce.   After mid-August 2015, the restaurant undertook a reduction in seasonal workforce, including bartenders, servers, runners and kitchen workers.   (Slawek Decl. ¶ 28.)   According to Michael Slawek, he kept Delaney's General Manager Ed Nielsen informed about the need to reduce Delaney's workforce. (<u>Id.</u> at ¶ 29.)   Slawek gave Neilsen the staffing levels he needed to operate the restaurant. (<u>Id.</u>)   Nielsen, however, was solely responsible for determining when particular terminations would occur and which seasonal worker would be terminated at any given time. (<u>Id.</u>)   Slawek claims he never had any discussions with Nielsen about terminating Coleman prior to Coleman's termination on September 21, 2015.   (<u>Id.</u> at ¶ 21.)

Although Coleman claims he advanced numerous complaints about various matters, the only racial work-related complaint Mr. Slawek received occurred in either late July or early August, 2015.   Mr. Slawek claims he was told that an employee heard another employee use a racial slur at work and management was asked to address the situation.   (Slawek Decl. ¶ 19.) Mr. Slawek claims he did not know the name of the

complainer or the alleged utterer of the slur. (Id.) At Mr. Slawek's direction, General Manager Ed Nielsen called a staff meeting to reinforce Delaney's policy that racially offensive language or conduct is not tolerated. (Slawek Decl. ¶ 20; Nielsen Dep. Tr., Ex. "I," at 91:11-92:19.) Coleman states that he doesn't recall any pre-shift meetings conducted by Ed Nielsen addressing the use of the "N" word by employees. Id. at 52:9-17.

Mr. Slawek states that he received no further complaints concerning racially offensive language. (Slawek Decl. ¶ 20.) Coleman disputes this statement and claims made two attempts to send his complaints to Delaney's management. First, he claims he sent two-page letter, certified mail, return receipt requested, from a post office in Philadelphia, Pennsylvania to "Michael Slawek, 426 Washington Street, Cape May, N.J. 08204" on September 19, 2015, two days before his termination. (Coleman Dep. Tr., Ex. "H," at 77:11-81:13.) The address used by Coleman is for The Ugly Mug, which Mr. Slawek co-owns with his father. (Slawek Decl. ¶ 32.) Coleman does not recall receiving the signed receipt for the letter and has no proof it was delivered. (Coleman Dep. Tr., Ex. "H," at 79:18-80:2.)

There is no evidence in the record to suggest that Mr. Slawek received Coleman's letter prior to Coleman's termination on September 21, 2015. (Id. at 83:19-84:3.) Mr. Slawek claims he did not receive or read Coleman's September 19, 2015 letter until after Coleman was terminated on September 21, 2015. (Slawek Decl. ¶ 34, Ex. "B.")

Second, Coleman contends he sent an email, the same day he mailed Mr. Slawek's letter on September 19, 2015, to Heidi DiLarso complaining about racially discriminatory and offensive conduct at Delaney's. (Coleman Dep. Tr., Ex. "H," at

87:6-23; Slawek Decl. Ex. "C.")   While Ms. DiLarso handles payroll for Delaney's, she has no management authority at Delaney's. (Slawek Decl. ¶ 36.) Rather, she is the manager of the Ugly Mug, with an office in that facility. (<u>Id.</u>)   According to Ms. DiLarso, the email was sent to her personal account.   (DiLarso Dep. Tr., Ex. "J," at 17:3-12.) She testified in deposition that she does not use that email address for business, that it is not publicly posted, that she does not regularly review her emails, and does not open emails from unknown email addresses. (<u>Id.</u> at 17:9-16, 19:25-21:8.)   Ms. DiLarso denies ever receiving an email from Coleman dated September 19, 2015. (Id. at 17:22-18:13.)

Mr. Slawek states that he and Ms. DiLarso never discussed Justin Coleman during Coleman's employment with Delaney's. (Slawek Decl. ¶ 37.)

## II.   <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a showing must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).   A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, will fail to preclude the entry of summary judgment. <u>Id.</u>

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). Any such inferences "must flow directly from admissible evidence[,]" because "'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citing Anderson, 477 U.S. at 255)).

Accordingly, the moving party initially has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Again, to withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).

> Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. The movant can support the assertion that a fact cannot

be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   Discussion

Analysis of claims made pursuant to the NJLAD generally follows the analysis of Title VII claims.   Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999). Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).   In assessing claims under Title VII and related retaliation claims, courts apply the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). Under that framework, a plaintiff must satisfy the initial burden of making a *prima facie* case of discrimination.

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show the following: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances that give rise to an inference of discrimination.   Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 412 (3d Cir. 1999).

If the employee makes out a *prima facie* case, the burden of production shifts to the employer to establish a legitimate, nondiscriminatory reason for its actions. Fuentes v. Borough of Watchung, 286 F. App'x 781, 784–85 (3d Cir. 2008). If the employer establishes a legitimate, nondiscriminatory reason for its actions, the burden of production shifts back to the employee to show that the employer's proffered reason was a pretext for actual discrimination. Id. The Third Circuit has held that a plaintiff may defeat a motion for summary judgment by pointing "to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id.

Title VII also prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII] . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish the following: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995).

Next, to establish a hostile work environment claim under the LAD, a plaintiff "must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's race; and [the conduct] was (2) severe or pervasive enough to make a (3)

reasonable [person of the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Taylor v. Metzger, 706 A.2d 685, 688-89 (N.J. 1998) (quotations omitted). The New Jersey Supreme Court requires a cumulative analysis of the incidents comprising an alleged hostile work environment. See Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 455 (N.J. 1993). "[A]n employer will be held vicariously liable in situations where it delegates authority to control a work environment to a supervisor, and the supervisor abuses that authority, or where sexual harassment is foreseeable and the employer is negligent in having in place or enforcing anti-harassment policies, or where the employer intended for or gave apparent authorization to the harassing conduct." Smith v. Exxon-Mobil Corp., 374 F. Supp. 2d 406, 421 (D.N.J. 2005)

## IV. Analysis

### A. Claim of Discrimination

The Court finds that Coleman cannot establish a *prima* facie case of racial discrimination against Miquon. Coleman can satisfy all of the criteria of a prima facie case of discrimination except the fourth factor—that the termination gives rise to an inference of unlawful discrimination. There is no evidence in the record to suggest that Coleman's separation from Delaney's was motivated by racial animus.

Even if Coleman could establish a *prima* facie case of discrimination, the record evidence supports Miquon's proffered reason for his separation as part of the seasonal pare down of the staff, which occurs at the conclusion of every summer and impacts employees of every racial background because it is based primarily upon seniority.

Miquon states that Coleman and 54 other employees were terminated at the end of the 2015 season. As an establishment at a shore town, the end of the summer results in a downturn in business. For this reason, over the course of many seasons, Delaney's significantly reduces its staff in a manner that reflects its needs as the Fall and Winter months approach and business declines. The reduction at the end of 2015 was, according to Miquon, undertaken to achieve this objective and a total of 55 seasonal employees were terminated; 43 were non-minorities. (Slawek Decl. ¶ 28.)

Coleman has not pointed to evidence in the record to suggest that Miquon's reasons for his termination were a pre-text for racial discrimination. Coleman's termination was part of the yearly, regular seasonal reduction in staff and his inclusion in the reduction was motivated by his lack of seniority and his inflexible schedule. Coleman, a resident of Philadelphia, told Ms. Hornbeck prior to his hiring that he was unavailable to work Sundays (church commitments), Tuesday nights (choir rehearsals) and most Wednesday nights (bible study). (Coleman Dep. Tr., Ex. "H," at 28:5-17.) Coleman likewise told Michael Slawek at or about the time he was hired that he could only work on a part-time basis, preferably on Fridays and Saturdays. (Slawek Decl. ¶ 10.) Coleman also told Mr. Slawek on multiple occasions that he had a full-time job in Philadelphia, that he had commitments to his church on Sundays and that he was involved in operating an online music business. (Id.)

The record evidence supports that the decision to terminate Justin Coleman and the 54 other employees terminated in August and September was necessitated by the seasonal decline in the restaurant's business. (Slawek Decl. ¶ 30; Nielsen Dep. Tr., Ex. I at 26:21-27:16.) When seasonal business declines and layoffs are required,

14

management at Delaney's considers several factors in determining which seasonal employee should be laid-off and in what order. These factors include the length of time the employee has worked at Delaney's, the employee's availability to work, and the employee's overall job performance. (Nielsen Dep. Tr., Ex. I at 89:6-90:2.) Coleman lacked seniority, being among the most recent hires and had limited availability to work.

In addition, Coleman has not put forth evidence to challenge the proffered reason for his termination as a pretext for racial discrimination. Coleman has not "submit[ed] evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108 (3d Cir. 1997) (internal citation and quotation marks omitted). Coleman's lack of seniority as one of the shortest-tenured employees, the decline of business at the end of the season, and Coleman's limited availability are legitimate, non-discriminatory reasons for his inclusion in the 54 staff members impacted by the reduction in force. (Nielsen Dep. 71:17-74:23)

While Coleman highlights instances of the use of racially offensive and insensitive language by members of the restaurant staff, Coleman has produced no evidence to suggest that his race, as an African-American, played any part in his inclusion in the reduction of the work force. See McCray v. DPC Industries, Inc., 942 F. Supp. 288, 293 (E.D. Tex. 1996) ("Racial comments that are sporadic or part of casual conversation do not violate Title VII.") To the contrary, the record reflects a diverse population included in both the reduction of force and in the population of workers chosen to remain during the "off-season." Delaney's avers it has the highest number and percentage of African-

15

American and other minority employees of any restaurant in Cape May, including current Delaney's employee, Nina Coleman, who is Justin Coleman's mother, and Coleman's cousins Marquees Coleman, who was a busboy at Delaney's in 2015 and Ashley Coleman, a server and bartender at Delaney's since early 2015. (<u>Id.</u> at ¶¶ 24-25.) Coleman has not challenged this evidence or demonstrated that he was included in the reduction in staff and/or treated disparately because of his status as an African-American. He has failed to identify any evidence that other employees not in his protected class were treated more favorably.

   As a result, there are no genuine issues of fact related to whether Coleman received disparate treatment because of his race and summary judgment is granted as to this claim. <u>Harris v. Holder</u>, 2016 WL 3388297, at *3 (D.N.J. June 13, 2016) (Granting summary judgment where there was no evidence that "similarly situated persons who are not African-American were treated more favorably.")

## B. <u>Retaliation</u>

There are no genuine issues of material facts related to whether Coleman's inclusion in the reduction of force was due in part to his complaints about the racially charged environment he claims existed at Delaney's. First, Coleman never put his complaints in writing during his time as an employee and, prior to his termination, he never complained to Michael Slawek about racially offensive conduct. (<u>Id.</u> at 62:17-63:2; Slawek Decl. ¶ 17; Coleman Dep. Tr., Ex. H. at 53:14-16.) Slawek testified that he did not know the name of the lone racial complainant, which prompted the staff meeting by Ed Nielsen in mid-summer. Although Coleman spoke to manager Bobbi Hornbeck on multiple occasions, his statements to Hornbeck were limited to complaints regarding

the customers he served.    (Hornbeck Dep. Tr., Ex. G at 25:18-26:9.)

Coleman has not pointed to any evidence to reflect that the Delaneys alleged frustration with Coleman's complaints played any part in the decision to terminate him. When relying on temporal proximity, a plaintiff will also have to demonstrate that the decision maker accused of taking the adverse action "had knowledge of the protected activity." Moore, 461 F.3d at 351.

Even if Coleman could recall to whom and when he made his verbal complaints, there is no evidence to support a causal connection between Coleman's participation in this protected activity and the adverse employment action. Nelson, 51 F.3d at 386. There is no proof that the certified letter Coleman sent to The Ugly Mug (two days before his termination) reached Slawek prior to Coleman's termination; Coleman does not have the return receipt and the evidence reflects that Slawek did not have the letter at that time.   Likewise, there is no evidence that Heidi DiLarso received and then acted upon the email Coleman sent to her private account.

Giving Coleman the benefit of every inference, he has failed to show that Delaney's would not have terminated his seasonal employment "but for" the fact that he complained. Young v. City of Philadelphia Police Dep't, 651 Fed. App'x 90, 96 (3d Cir. 2016). Coleman's status as the least senior member of the seasonal staff coupled with his limited schedule gives his inclusion in the reduction of force merit.   Therefore, even if Coleman had evidence that he frequently complained "courts routinely have . . . granted summary judgment in favor of an employer where the plaintiff's termination would have occurred regardless of any alleged retaliatory motive." Costa v. Pa. Dep't of Revenue, Civ. No. 12-854, 2014 WL 1235879 at *13, (W.D. Pa. Mar. 25, 2014). For these reasons,

Coleman's retaliation claim fails and summary judgment will be granted.

C. **Hostile Work Environment**

Miquon argues that Coleman's claim of hostile work environment fails because Title VII is not a general workplace civility code. Miquon argues that Coleman cannot demonstrate that any comments about Coleman's race were ever made to Coleman. In addition, even if some comments made by employees were said, Coleman is unable to recall the circumstances and, therefore, cannot prove that the conduct was sufficiently severe or pervasive to create a hostile work environment. The Court agrees.

Title VII is not violated by "[m]ere utterance of an … epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe or pervasive as to constitute an objective change in the conditions of employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998) (citations omitted).   In determining the existence of a hostile environment, courts look at the totality of all the circumstances including the frequency of the conduct, the severity of the conduct, whether it is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with an employee's work performance. Faragher, 118 S. Ct. at 2283.

The employee's perception of a hostile environment must be subjectively felt and objectively reasonable. Id. "For racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments." Schwapp v. Town of Avon, 118 F.3d 106, 110–11(2d Cir.1997); Al-Salem v. Bucks Cty. Water & Sewer Auth., No. CIV. A. 97-6843, 1999 WL

18

167729, at *5 (E.D. Pa. Mar. 25, 1999).

To establish a claim under Title VII based on an intimidating or offensive work environment, a plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996). The frequency of the conduct identified by Coleman is insufficient to establish a hostile working environment. Lawrence v. F.C. Kerbeck & Sons, 134 F. App'x 570, 571–72 (3d Cir. 2005). The conduct Coleman identifies is infrequent and there is no evidence put forth by Coleman to establish that the conduct interfered with his work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993).

Coleman has not identified language that was intentionally used against him because of his race that he faced discrimination so regularly and pervasive that it detrimentally affected him. He was unable to place the utterances into a context or give a timeframe, and, while he does aver that offense language was used, his descriptions depict sporadic use of racist slurs by non-managerial employees. He was unable to recall when he made verbal complaints. Given the opportunity to expand on the manner in which the racist language was used, Coleman stated that it was used and did not recall or detail any facts to show that the racist language was weaponized.

In addition, even if the employee language could be construed as creating a hostile working environment, there is no basis for vicarious liability. See Caver v. City of

Trenton, 420 F.3d 243 (3d Cir. 2005). "In evaluating a hostile work environment claim under ... Title VII ... we are mindful that offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 262-3 (internal citations omitted). In Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009), the Third Circuit held that "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Id. (citing Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2001, abrogated in part on other grounds by, Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53, 67 (2006)).   The test is whether "an employer knew or should have known about workplace [ ] harassment if management-level employees had actual or constructive knowledge about the existence of a [ ] hostile work environment." Id. (internal quotation marks and emphasis omitted). In addition, courts measure whether "[a]n employer's remedial action is adequate if it is reasonably calculated to prevent further harassment." Id. at 110.

The record reflects that when Mr. Slawek became aware of an anonymous complaint in mid-summer, he ordered a staff meeting which was ultimately held by Ed Nielsen. Neither Nielsen or Slawek received any additional complaints and Coleman agrees that he did not send any written complaints until he mailed and emailed the letters on the weekend preceding his termination. Thus, there is no genuine issue as to any material fact regarding whether Miquon knew of the alleged harassment and failed

to take prompt and adequate remedial action. There are no written complaints made by Coleman, with the exception of the email and letters he allegedly sent days prior to his termination, or any evidence that other employees had ever made a complaint of discrimination or harassment. Therefore, even if the racial slurs uttered by Coleman's co-workers are sufficient to establish a hostile work environment, there is no evidence in the record to support a claim of vicarious liability against Miquon.

### V. Conclusion

For the reasons set forth above, as well as those expressed on the record, summary judgment is granted in favor of Miquon.

An appropriate Order shall issue.

Dated: December 17, 2019

s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE